**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **LINDSAY ROSS, on her own behalf and on behalf of her minor daughter, E.P.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **3:23 C 50339** |
| | ) | |
| **COMMUNITY HIGH SCHOOL DISTRICT** | ) | **Judge Rebecca R. Pallmeyer** |
| **NO. 155 BOARD OF EDUCATION,** | ) | |
| **KIMBERLY DAHLEM, DONA TAYLOR,** | ) | |
| **and TAYLOR SMITH,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

E.P. is a high-school student in Community High School District No. 155 and a lover of art. She has several serious medical conditions that qualify her as a disabled person under federal law. E.P. dropped out of Cary Grove High School during her freshman year after school and district administrators allegedly discriminated against her on the basis of her disability by effectively excluding her from two art classes and a seminar designed to aid freshmen in their transition to high school. E.P.'s mother, Lindsay Ross, advocated for her daughter to receive appropriate accommodations that would enable her to attend these classes, but Plaintiffs allege that she was met with denial, hostility, and retaliation. Ross brings claims on her own behalf and on behalf of her daughter under the Americans with Disabilities Act, the Rehabilitation Act, and the Illinois Human Rights Act. She alleges that District 155 discriminated against E.P., both intentionally and by failing to accommodate her, and retaliated against both E.P. and Ms. Ross after they requested accommodations and made complaints about the denial of those requests. District 155 has moved [62] for summary judgment. For the reasons outlined here, the motion is denied.

## BACKGROUND

### I.    Factual Background[1]

E.P., a high school student, is classified as disabled by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.  (DSOF [60] ¶ 6.)  She was born in 2008 with several medical ailments, including but not limited to pulmonary aplasia (born with a single lung), cardiac dextroposition (displaced heart), tracheomalacia (maldeveloped windpipe), and autonomic dysfunction (nerve damage affecting blood pressure, temperature control, digestion, etc.).  (PSOF [80] ¶ 1.)  As she grew up, E.P. developed a severe case of scoliosis and required spinal fusion prior to her freshman year of high school.  (*Id.*)  Due to her medical conditions, "E.P. has at all relevant times used a gastrostomy feeding tube to eat and, with the assistance of a tracheal tube, has sometimes required a ventilator to breathe."  (*Id.*)  She has also been diagnosed with anxiety, ADHD, and depression.  (*Id.*)  Facts regarding E.P.'s medical condition are not disputed by the parties.  (*See id.*; Def.'s Response [60] ¶ 1.)

Before enrolling as a student in Community High School District No. 155 ("District 155" or "District"), E.P. attended Deerpath Elementary School, Fox River Grove Middle School, and Prairie Grove Middle School, all of which are in other school districts.  (DSOF [60] ¶ 6.)  Each of these schools provided an Individualized Education Program ("IEP") to accommodate E.P.'s medical conditions.  IEPs are developed via a collaborative effort that includes the input of the student, parents, school staff members, and attorney representatives for the parents and the school.  (*Id.* ¶ 9.)  E.P.'s mother, Lindsay Ross, actively participated in the development of her daughter's IEP.  (*Id.* ¶ 7.)

---

[1]    The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1.  District No. 155's Local Rule 56.1 Statement of Material Facts [60] is cited here as "DSOF ¶ ___." Plaintiffs' Response to Defendant's Local Rule 56.1 Statement [79] is cited here as "Pls.' Response ¶ ___." Plaintiffs have also submitted an Additional Statement of Facts [80], cited here as "PSOF ¶ ___." Defendant's Response to Plaintiff's Additional Statement of Facts [82] is cited here as "Def.'s Response ¶ ___."

Prior to the start of the official school year, E.P attended a 2022 summer school course in person at Crystal Lake Central High School, a District 155 school, as part of her IEP's Extended School Year ("ESY") accommodation. (Ross Dep. [68] at 40:4–13.) During her ESY enrollment at Crystal Lake, E.P. was assigned a one-on-one nurse to assist her with medical needs during the school day. (DSOF [60] ¶ 12.) At some point during the summer, but after her enrollment in Crystal Lake for ESY, doctors determined E.P. would need spinal fusion surgery to treat her scoliosis. (*Id.* ¶ 16; Ross Dep. [68] at 41:18–42:11.) E.P. then enrolled at another District 155 school, Cary Grove High School ("CGHS"), for her freshman year. (DSOF [60] ¶ 8.) Her surgery was scheduled for August 25, 2022, two weeks into the school year.[2] (*Id.* ¶ 15; Ross Dep. [68] at 48:14–18.) Before the procedure, E.P. attended her classes virtually to ensure she remained healthy in preparation for her surgery. (*Id.* ¶ 16.) District 155 offered E.P. the ability to attend classes virtually from her home via the use of a "V-Go", a robot on wheels that displays the student's live image on a screen. The V-Go was physically present in the classroom, and, while using it, E.P. had the ability to control the robot and communicate with the classroom from a remote location. (*Id.* ¶ 17.) E.P. used the V-Go during the first two weeks of the fall semester, but she claims that it would "glitch" on her and that she had problems with functionality. (Ross Dep. [68] at 137:19-138:5; E.P. Dep. [70] at 29:3-13.)

### A. Freshman Seminar

After her surgery, E.P. was able to begin attending some classes in person. By September 30, 2022, she was attending two classes in person, and two classes remotely. (DSOF [60] ¶ 18.) On September 30, 2022, Ms. Ross met with employees of District 155 and other members of E.P.'s support team, including Ms. Dona Taylor, District 155's Special Education Divisional Leader, a case manager, and a school counselor, to discuss E.P.'s IEP. (PSOF [80] ¶ 3; Def.'s

---

[2] The court takes judicial notice that the first day of the 2022–23 school year at CGHS was August 11, 2022. *School Calendar*, CARY GROVE HIGH SCH., https://cg.d155.org/about/school-calendar?cal_date=2022-08-01 (last visited Mar. 18, 2026).

3

Resp. [82] ¶ 3; DSOF [60] ¶¶ 3, 9; *see also* Taylor Dep. [66] at 30:19–31:5.)[3] Of particular concern to Ms. Ross was E.P.'s social-emotional development, and Ms. Ross requested that E.P. be provided with more opportunities to engage with her peers. (PSOF [80] ¶¶ 3–4.) The IEP team and Ms. Ross discussed the Freshman Seminar specifically as one of these opportunities. CGHS offers the Freshman Seminar as a course where new students interact with upperclassmen to discuss navigating the high school experience. (*Id.* ¶ 2; DSOF [60] ¶ 25.) Completion of the Freshman Seminar is not a graduation requirement (DSOF [60] ¶ 27), but Ms. Ross requested that accommodations, including social distancing, be adopted to enable E.P. to attend the Freshman Seminar in person. (PSOF [80] ¶¶ 3–5.)

The District's response to this request is somewhat disputed by the parties. Both sides agree that the IEP team informed Ms. Ross that the Freshman Seminar course had a large enrollment of upwards of 30 students. (DSOF [60] ¶ 26; Pl.'s. Resp. [79] ¶ 26.) But the parties disagree regarding Ms. Taylor's comments about distancing. (DSOF [60] ¶ 3.) According to District 155, Taylor simply informed Ms. Ross that Illinois mandated just three feet of social distancing instead of six. (Def's Resp. [82] ¶ 4.) But Plaintiffs characterize Ms. Taylor as

---

[3] The District challenges many of the facts alleged in Plaintiffs' Additional Statement of Facts as immaterial because "Plaintiffs have failed to exhaust the administrative process provided to E.P. by the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et seq*. ("IDEA"), since Plaintiffs seek educational remedies, such as, E.P.'s integration into the least restrictive environment or a provision of specific academic services to E.P. as a result of her disability." (*See e.g.*, Def.'s Resp. ¶ 3 (citing 20 U.S.C. §1415(a)(1)(A), (a)(5); 20 U.S.C. §1415(1); *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154 (2017)).) The first time the District has raised this argument is in their summary judgment reply brief [83], however. The District did not move to dismiss on this basis, did not raise the matter in its opening summary judgment submissions, and did not assert failure to exhaust as an affirmative defense. (Indeed, no answer to Plaintiffs' amended complaint appears in the record at all.) The court recognizes the value of the administrative process, but in this case, the exhaustion argument has been forfeited. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). ("[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond."); *see also McIntyre v. Eugene Sch. Dist. 4J,* 976 F.3d 902, 907 n. 2 (9th Cir. 2020) (explaining that IDEA's exhaustion requirement is a non-jurisdictional affirmative defense and, thus, waivable). In any event, exhaustion under the IDEA is only relevant to Plaintiffs' request for equitable relief. The Supreme Court has determined unanimously that failure to exhaust under the IDEA does not preclude seeking relief for monetary damages. *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023).

"bec[oming] hostile, mock[ing] the concept of social distancing and ma[king] light of the requested accommodation." (PSOF [80] ¶ 4.) District 155 asserts that, as recorded in the IEP Meeting Notes, Dr. Shelley Fischer, a District 155 social worker, recommended that, rather than attending the Freshman Seminar, E.P. should instead attend the "SHIELD for Social Emotional Group," a smaller environment to limit exposure. (Def's Resp. [82] ¶ 6.) If SHIELD is an acronym, the parties have not explained this. The record does show, however, that the SHIELD room is not a formal class; it is instead a space within the school where students could attend "a student group therapy session where students discussed their social emotional concerns." (DSOF [60] ¶ 20–21.)) Defendant contends that Dr. Fischer informed Ms. Ross that participating in SHIELD would provide E.P. with a greater opportunity for social interaction than she would have in the Freshman Seminar. (Def's Resp. [82] ¶ 6.) Plaintiffs dispute this account—they claim the SHIELD room was offered to E.P. only after Ms. Ross complained of disability discrimination at the same meeting. (PSOF [80] ¶ 6; Ross Dep. [68] at 58:5-19.) And similarly, Plaintiffs contend that Ms. Taylor offered that E.P. could attend the Freshman Seminar using the V-Go robot only after Ms. Ross complained. (PSOF [80] ¶ 6.)

On October 1, 2022, Ms. Ross wrote to the Assistant Superintendent of Student Services and Special Education, Kimberly Dahlem, and CGHS Principal Neil Lesinski via email "requesting that a formal complaint be filed regarding the hostility displayed by Ms. Taylor, the Defendant's refusal to provide a modification to allow for E.P. to attend class in person, and further requested that Ms. Taylor no longer be in charge of E.P.'s IEP meetings." (PSOF [80] ¶ 21.) Evidently in response to Ross's email, District 155 claims that by October 4, 2022, the District had offered E.P. the opportunity to attend the Freshman Seminar either in person or via the V-Go. (DSOF [60] ¶ 28.) But according to Plaintiffs, "E.P. was never allowed a reasonable modification [i.e., social distancing in the classroom] that would have allowed her to attend in person." (Pls.' Resp. [79] ¶ 28.) Indeed, in an October 4, 2022 email from Ms. Dahlem to Ms. Ross, Dahlem confirmed that "[u]pwards of 30 students attend Seminar and are not socially distanced." (Def. Ex. 9 [73] at

5

2.)  "If there is a level of discomfort due to the high number of students in the space," Dahlem offered, E.P. could "attend via Vgo from another place in the building." (*Id.*)  But according to Plaintiffs, E.P.'s need for social distancing "was implemented in her other classrooms without issue and had been successfully applied in larger settings such as concerts and sporting events." (PSOF [80] ¶ 11.)

Ultimately, E.P. and Ms. Ross declined the V-Go option for two reasons:  E.P.'s older sister, a former student at CGHS, had told E.P. that students had in the past "made fun of other students" who had used the V-Go; and the V-Go "did not function properly when E.P. did attempt to access it on several occasions." (DSOF [60] ¶ 29; Pls.' Resp. [79] ¶ 29 (citations omitted).) Ultimately, because of what Plaintiffs allege was District 155's "refusal to accommodate" E.P.'s request for social distancing, E.P. did not attend the Freshman Seminar but instead enrolled in the SHIELD room.  (PSOF [80] ¶ 9.)  According to Plaintiffs, E.P. "received no educational instruction during her time in the SHIELD room as the [SHIELD] room was little more than a study hall." (*Id.* ¶ 10.)  The District disputes this characterization, arguing that E.P.'s time in the SHIELD room involved "80 monthly minutes in the Freshman transition to high school group, 80 monthly minutes for the Social Support Group, and 160 monthly minutes for SHIELD SEL curriculum."[4] (Def's Resp. [82] ¶ 10.)

### B.    Visual Art and Technology ("VAT")

Prior to E.P.'s August 2022 surgery during the fall semester, E.P. was enrolled in a course entitled Visual Art and Technology ("VAT"), which is a "lab course that is an introduction to computers and digital art which includes subject matter pertaining to photography, graphic design, digital illustration, and animation.  (DSOF [60] ¶ 31.)  Students enrolled in VAT were required to attend in-person due to "issues with lag time, the teacher's inability to view students performing key strokes, and students not having the required software" on home computers.  (*Id.* ¶ 32–33.)

---

4    Like "SHIELD," the acronym "SEL" is unexplained in the record.

Plaintiffs do not dispute this point. (Pls.' Resp. [79] ¶ 33.) E.P. was initially enrolled in the VAT course, and the District contends that it worked to accommodate her remote learning in the class in the two weeks prior to her surgery. Plaintiffs dispute this, alleging that E.P. "was never provided the proper equipment to attend VAT class remotely." (*Id.* ¶ 35–37.) But the District claims that E.P. was provided with a computer for participation in the course, and that E.P. "had the required extra equipment at her home to participate in the VAT course." (Def.'s Resp. [82] ¶ 12.)

Ultimately, however, on or about September 26, 2022, some time before E.P. returned to in-person instruction after her surgery, the District decided to remove E.P. from the VAT course because "she fell too behind in coursework." (DSOF [60] ¶ 35–37.) Plaintiffs claim that E.P. made repeated requests for makeup work, but was ignored (PSOF [80] ¶ 13); but the District asserts, to the contrary, that Ms. Taylor "never had any conversations with Plaintiffs regarding the VAT course or makeup for the VAT course." (Def's Resp. [82] ¶ 13.) The District and school staff who were part of E.P.'s IEP team based their decision on their assessment that "greater educational benefit would result from attending core curriculum classes [rather than VAT] in person," though they made the decision before offering any alternative to removal from the course and without input from E.P.'s family. (DSOF [60] ¶ 36; PSOF [80] ¶ 15.) When she was given the chance to do so, E.P. was successfully able to catch up in her other courses after she returned to in-person learning. (PSOF [80] ¶ 20.) The team informed E.P. that she could enroll in VAT during the summer of 2023 (DSOF [60] ¶ 38), but by this point, Plaintiffs assert, the damage was done: Plaintiffs say that "[b]eing forcibly removed from VAT was especially hurtful to E.P. as E.P. 'lived for art.'" (PSOF [80] ¶ 18 (quoting Ross Dep. [68] 201:14-22).)

Hoping to avoid E.P.'s removal from the class, Ms. Ross recommended several alternative options, "including providing E.P. assistance to make-up for tardy assignments, excusing tardy assignments while E.P. was convalescing, or offering E.P. a 'pass/fail' alternative," but the District rejected all of these alternatives. (PSOF [80] ¶ 16.) Eventually, E.P. was able to enroll in the VAT course during the summer at another District 155 high school, Crystal South High School.

(*Id.* ¶ 17.)  At Crystal South, E.P. was able to attend the VAT class remotely when necessary because, as Plaintiffs allege, the Crystal South High School administrators provided E.P. with "equipment that she did not receive from the [CGHS] administration even though the [CGHS] administration had the ability to provide E.P. the same equipment."  (*Id.*)  Again, the District disputes this, contending that CGHS administrators *did* provide E.P. with the necessary equipment for her to participate in VAT remotely.  (Def.'s Resp. [82] ¶ 17.)

### C.     Studio Art[5]

During the 2022–23 school year, E.P. was also enrolled in the Studio Art course at CGHS, taught by Ms. Taylor Smith.  (DSOF [60] ¶¶ 41, 44.)  Because E.P.'s seating arrangements in the Studio Art classroom are central to her discrimination claims, the court will describe the classroom in some detail.

The Studio Art class met in classroom H12 of CGHS.  The classroom consisted of "two long rows of high-top tables with stools, a teacher's desk that was parallel with the aforementioned rows of high-top tables, and a hanging projection screen."  (*Id.* ¶ 43.)  E.P. required accommodation in terms of her seating arrangements to ensure she was sufficiently socially distanced, and because she was still recovering from her back surgery and prone to great discomfort while sitting.  (PSOF [80] ¶ 24.)  During the course of her enrollment in Studio Art, the District claims that E.P. was seated in four different locations.  At first, E.P. "sat on the side of one of the rows of high-top tables with a high chair that had a back and E.P. had to twist to see the projector."  (DSOF [60] ¶ 45.)  Then, E.P. was moved to "a front-facing section of the row of high-top tables with a high chair that had a back."  (*Id.* ¶ 46.)  After that, E.P. was "provided with a standard desk that was placed between the teacher's desk and one of the long rows of high-top tables."  (*Id.* ¶ 47.)  And finally, E.P.'s standard desk was moved to a place adjacent to one of the

---

[5]        The parties refer to the Studio Art course as either "Studio Art" or "Studio One Art." (*See e.g.,* PSOF [80] ¶ 24; Def. Resp. [82] ¶ 24.)  To avoid confusion, the court will refer to this course simply as "Studio Art."

long rows of high-top tables. (*Id.* ¶ 48.) Plaintiffs do not dispute the District's description of these seating arrangements, but they contend there was a fifth arrangement as well. (Pls.' Resp. [79] ¶ 44–48.) According to Plaintiffs, Ms. Smith "grew frustrated with E.P." and assigned her to sit "alone next to a large, open, utility trash bin that touched E.P.'s desk," despite the fact that E.P. "sometimes used a tracheal tube and ventilator to breath[e]." (PSOF [80] ¶ 25.) It is unclear if E.P.'s seat next to the trash bin was one of the four arrangements the District describes, or a fifth arrangement, but in any case, the District disputes that E.P. was ever seated next to a trash bin, stating that "[a]t no point in time during her enrollment in Studio Art [] during the 2022–2023 school year did E.P. sit in a desk next to a trash[]can." (Def.'s Resp. [82] ¶ 25.) Still, Plaintiffs state that "[t]he seating assignment was unnecessary and isolating as there were additional places in the oversized classroom for E.P. to sit or, in the alternative, to place the trash bin without embarrassing E.P. and jeopardizing her health." (PSOF [80] ¶ 25.)

Ms. Smith's actions towards E.P. are hotly disputed. According to Plaintiffs, Ms. Smith "continually denied E.P.'s requests to sit next to other students, informing E.P., in the presence of other students, that E.P. was a fire hazard, that her presence in the classroom posed a danger to her fellow classmates . . . that it was E.P.'s obligation to work with her physical therapist so that she could sit in the regularly assigned seats like her fellow classmates," and that "if she wanted to feel more included[,] E.P. could stand next to her classmates during instruction and return to her seat as needed." (PSOF [80] ¶¶ 26, 28.) The District disputes that Ms. Smith made any of these statements. (Def.'s Resp. [82] ¶¶ 26, 28.) Plaintiffs also claim that, in response to E.P.'s sitting by herself, "E.P.'s nurse obtained a chair and placed it next to E.P.'s chair so that other students could sit next to E.P. during class," but Ms. Smith "immediately removed the chair, instructing E.P. that her peers were prohibited from sitting next to her." (PSOF [80] ¶ 27.) The District offers a different account: that "the chair was eventually removed because no one was using the chair," and that "E.P. was eventually moved directly next to a cluster of tables so that she could be seated next to a friend." (Def.'s Resp. [82] ¶ 27.) Further, Plaintiffs claim that "Ms.

9

Smith warned E.P. against making any further complaint, specifically instructing E.P. that she did not want Ms. Ross complaining about E.P.'s seating arrangements or Ms. Smith's hurtful statements to E.P."[6] (PSOF [80] ¶ 28.) But again, the District disputes that Ms. Smith ever made those statements. (Def.'s Resp. [82] ¶ 28.)

Eventually, Plaintiffs claim, the District removed E.P. from the class "for accessing the SHILED [sic] room in lieu of attending" Studio Art. (PSOF [80] ¶ 29.) Defendants contest this characterization, pointing out that E.P.'s March 3, 2023 IEP meeting notes "reflect that E.P. refused to attend Studio Art One despite the changes to her seating assignment," evidently at the instruction of her mother, Ms. Ross. (Def.'s Resp. [82] ¶ 29; *see also* Meeting Notes, Def. Ex. 16 [78] at 20.) The District claims that "[d]ue to the amount of content missed since January and [E.P.'s] report of not wanting to attend," E.P.'s schedule was changed to replace her Studio Art block with another SHIELD period. (Def.'s Resp. [82] ¶ 29 (citation and internal quotation marks omitted).) This arrangement was made, according to the District, with the agreement of Ms. Ross and the family's attorney. (*Id.*)

### D. Subsequent Interactions between Ms. Ross and the District

Ms. Ross continued to advocate for her daughter throughout the course of E.P.'s enrollment at CGHS. The court recounts a few of these interactions below.

On November 21, 2022, Ms. Ross met with E.P.'s IEP team again to discuss how things were going for E.P. During the meeting, Ms. Ross expressed concern that "a school nurse responsible for E.P.'s medical needs was scared to care for E.P. because she was not adequately trained in the administration of E.P.'s ventilator." (PSOF [80] ¶ 22.) How Ms. Ross became aware

---

[6] Defendants raise a hearsay objection to the inclusion of this statement in Plaintiffs' Statement of Facts and argue that the court cannot consider this evidence at the summary judgment stage. But Ms. Smith's statements to E.P. appear to be a warning or an instruction— that is, a verbal act rather than a declaration offered for its truth. In any event, Ms. Smith's statements, and other statements made by the District's employees, easily fall into the exception outlined in FED. R. EVID. 801(d)(2)(D) excepting a party opponent's statements from the hearsay bar, as Ms. Smith was an employee of the District at the time and made these statements within the scope of her employment.

of the nurse's reported fear is unexplained, but the District disputes her characterization. Instead, the District asserts that Nurse Arena, E.P.'s one-on-one nurse, held the appropriate certifications and training to assist with E.P.'s ventilator and treat her medical needs. (DSOF [60] ¶ 52.) The District also claims that one week before the November 21 Meeting, a Licensed Practical Nurse shadowed Nurse Arena to provide secondary support including assistance with E.P.'s ventilator when necessary. Following the November 21 Meeting, the District "retained" the secondary support nurse for her services; it is unclear whether this second nurse was specifically assigned to provide support for E.P. (Def.'s Resp. [82] ¶ 22.)

In addition, according to Plaintiffs, during the course of the meeting Ms. Dahlem "became hostile towards Ms. Ross and attributed Ms. Ross' concerns and E.P.'s struggles and/or needs to 'parent induced trauma.'" (PSOF [80] ¶ 23.) The District denies that Ms. Dahlem became hostile, and denies that Ms. Dahlem made the statement Plaintiffs attribute to her. (Def.'s Resp. [82] ¶ 23.)

Near the end of January 2023, Ms. Ross learned about E.P's seating arrangement in Studio Art and Ms. Smith's alleged comments to her daughter. In response, she raised her concerns with CGHS Principal Lesinski and then filed a formal complaint with the Illinois State Board of Education ("ISBE"). (PSOF [80] ¶¶ 30–32.)

On March 3, 2023, various CGHS administrators, Ms. Dahlem, and Ms. Ross met to discuss E.P.'s IEP in what Ms. Dahlem referred to in her deposition as a "problem solving conference". (Dahlem Dep. [65] at 69:19–24.) There, Plaintiffs claim Ms. Dahlem "became abusive and hostile towards Ms. Ross." (PSOF [80] ¶ 34.) Plaintiffs allege that Ms. Dahlem (1) "inform[ed] M[s]. Ross that the administration believed Ms. Ross to be a bully who was mentally unstable;" (2) told Ms. Ross that she believed Ms. Ross's "concern for her daughter was contrived," (3) expressed that "E.P.'s difficulties at school were caused by Ms. Ross," and (4) "threatened to report Ms. Ross to the authorities for child abuse." (*Id.*) The District claims that Ms. Dahlem instructed Ms. Ross that Ms. Ross's "bullying [must] stop because Ms. Ross was

11

verbally abusing District 155 staff members." (Def.'s Resp. [82] ¶ 34.) The District also asserts that "no District 155 employee ever reported Ms. Ross to any governmental agency," but does not deny that Ms. Dahlem discussed involving child protective services with Ms. Ross at the meeting. (*Id.*; Dahlem Dep. [65] at 80:17–81:14.)

### E. Impact on E.P.

After the March 3, 2023 meeting, "E.P.'s mental state declined significantly," and "her physical pain . . . increased significantly." (PSOF ¶ 35.) E.P. received a medical certification excusing her from further attending CGHS for the remainder of her freshman year, and E.P. stopped attending school at CGHS after the March 3, 2023 meeting. (*Id.* ¶ 37; DSOF ¶ 57.)

Plaintiffs contend that school staff engaged in malicious behavior directed towards E.P. and Ms. Ross. For example, Plaintiffs allege that, on E.P.'s last day of school, the District required Ms. Ross to pick E.P. up from a different location than the handicapped exit, which was E.P.'s usual exit. This meant that E.P. had to "walk much further than normal to exit the building while in excruciating pain." (PSOF ¶ 38.) Plaintiffs also claim that, on that same day, the District required Ms. Ross personally to return medical equipment the school had provided to E.P. during the school day, something District personnel had always helped with in the past. (*Id.* ¶¶ 38–39.) The District disputes this, stating that Ms. Ross picked E.P. up from a different location because Ms. Ross signed E.P. out early for the day. (Def.'s Resp. ¶ 39.)

E.P.'s IEP team attempted to reconvene in April 2023, but Ms. Ross did not solidify a meeting date or attend any other IEP team meetings following March 2023. (DSOF ¶ 58.)

Eventually, E.P. enrolled in different District 155 high schools, where she continued to receive special education services. (DSOF ¶ 59.) Due to her early withdrawal from her freshman year, E.P. has been taking supplemental courses in an attempt to graduate on time. (PSOF ¶ 40.) She hopes to graduate at the end of the 2025-2026 school year with her twin sister, but, according to Plaintiffs, it is not clear that she will be able to do so. (*Id.*)

12

II.     **Procedural Background**

This lawsuit resulted.  Plaintiffs' Amended Complaint brings ten claims against District 155 on behalf of E.P: disability discrimination in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*. (Count I); retaliation in violation of the ADA (Count II); discrimination in violation of Section 504 of the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794 *et seq.* (Count III); retaliation in violation of the Rehab Act (Count IV); discrimination in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*. (Count V); retaliation in violation of the IHRA (Count VI); intentional infliction of emotional distress (Count VII); willful and wanton negligence (Count VIII); respondeat superior (Count IX); and indemnification (Count X).  Ross brings Counts II, IV, VI, VII, VIII, IX, and X on her own behalf as well. (*See* Am. Compl. [20].)  The complaint also includes claims of discrimination and retaliation in violation of the IHRA, intentional infliction of emotional distress, and willful and wanton misconduct against individual Co-Defendants Kimberly Dahlem, Dona Taylor, and Taylor Smith. (*See* Am. Compl. [20].)  Defendants moved to dismiss [24] all counts, but Judge Reinhard of this court denied the motion on September 23, 2024 [45].  On August 22, 2025, the District moved for summary judgment [62]. Plaintiffs responded [81] on September 19, 2025.  Plaintiffs confirmed in their response that they had waived "the individual capacity state law claims against Defendants Kimberly Dahlem, Dona Taylor and Taylor Smith contained in Counts V, VI, VII and VIII"[7] as well as the claims against the District in Counts VII and VIII.  (*See* Pls.' Opp'n [81] at 1 n.1.)  The only claims remaining, therefore, according to Plaintiffs, are Plaintiffs' claims against the District in Counts I through VI against the Board.[8]  (*Id.*)  The motion is now fully briefed and ready for the court's consideration.

---

[7]     It appears these individuals are no longer employed by the District, as the district describes each of them as "previously employed."  (DSOF ¶ 2–4.)

[8]     Plaintiffs do not explicitly state that they waive their claims under Counts IX and X, but because all claims against the District's employees have been waived, Plaintiffs have no basis

13

## LEGAL STANDARD

Summary judgment is appropriate "if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, "the district court must construe all facts and draw all reasonable inferences in favor of the non-movant." *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57 (1986). Speculation "cannot create a genuine issue of fact that defeats summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## DISCUSSION

### I. ADA, Section 504, and IHRA Claims

Plaintiffs bring Counts I–IV under the ADA and the Rehab Act, alleging that the District violated both via their discriminatory and retaliatory conduct. Both statutes generally prohibit discrimination in public programs on the basis of disability, *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018), and "make it unlawful to retaliate for the exercise of rights conferred by those statutes." *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 641 (7th Cir. 2015) Plaintiffs also bring Counts V and VI under the IHRA, which, like its

---

to pursue claims based on *respondeat superior* or indemnification. The court deems these claims waived as well.

14

federal counterparts, prohibits discrimination in places of public accommodation including "a non-sectarian nursery, day care center, elementary, secondary, undergraduate, or postgraduate school, or other place of education." 775 ILCS 5/5/101(A)(11). The IHRA categorizes retaliation for opposing unlawful discrimination as a type of discrimination covered by the statute.

The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[9] 42 U.S.C. § 12132. The ADA's implementing regulations include an "integration mandate" which requires "[a] public entity [to] administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016) (quoting 28 C.F.R. pt. 35, App. B).

Similarly, the Rehab Act mandates that no "otherwise qualified individual with a disability" shall, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[10] 29 U.S.C. § 794. The Rehab Act, like the ADA, contains "a corresponding regulation requiring that an agency administer its programs and activities 'in the most integrated setting appropriate to the needs of qualified handicapped persons.'" *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004) (quoting 28 C.F.R. § 41.51(d)).

---

[9]     The District does not contest that E.P. is a "qualified individual" under the ADA and RA. (*See* Def. Br. [63] 5–6.)

[10]     The Rehab Act requires Plaintiffs to show that the District "received federal financial help." *Thurmon v. Mount Carmel High Sch.*, 191 F. Supp. 3d 894, 898 (N.D. Ill. 2016) (cleaned up). The District does not raise this issue in its motion or argue that it is not federally funded. (Def. Br. [63] at 5–10.)

Because "Title II of the ADA was modeled after § 504 of the Rehabilitation Act[,]" and because "the elements of claims under the two provisions are nearly identical," the Seventh Circuit has determined "that the standards applicable to one act are applicable to the other." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999).

With respect to claims challenging a school's conduct, the IHRA limits its jurisdiction to specific injuries: "(1) the failure to enroll an individual; (2) the denial or refusal of full and equal enjoyment of facilities, goods, or services; or (3) severe or pervasive harassment of an individual when the covered entity fails to take corrective action to stop the severe or pervasive harassment." 775 ILCS 5/5-102.2. Still, the "The Illinois Supreme Court instructs that in evaluating claims of discrimination brought under the IHRA, courts should apply the same test employed by federal courts in evaluating causes of action brought pursuant to . . . the ADA." *Nutall v. Rsrv. Marine Terminals*, No. 1:14 CV 4738, 2015 WL 9304350, at *8 (N.D. Ill. Dec. 22, 2015). Courts considering claims under the ADA, the Rehab Act, and the IHRA thus regularly evaluate all three under the same standards, and the court will do so here as well. *See e.g.*, *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 995 n.1 (7th Cir. 2024) ("Because disability discrimination claims under the Illinois Human Rights Act are analyzed under a framework that is practically indistinguishable from the federal disability discrimination analysis, we focus on the federal disability claims." (citation and quotation marks omitted)); *McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038, 1043 (N.D. Ill. 2017); *Trimuel v. Chicago Hous. Auth.*, 695 F. Supp. 3d 972, 978 (N.D. Ill. 2023).

### A. Discrimination

To make out a claim of disability discrimination under the ADA and the Rehab Act, a plaintiff must demonstrate "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Holzmueller*, 881 F.3d at 593. Plaintiffs here allege

16

both intentional discrimination and failure to accommodate E.P., though they lean more heavily on the latter theory.  (Pls.' Opp'n [81] at 13–14.)  The court will address each theory in turn.

### 1.     Failure to Accommodate

The ADA requires "a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary" to avoid discrimination on the basis of a disability.  *Fry*, 580 U.S. at 160 (quoting 28 C.F.R. § 35.130(b)(7)).  The Rehab Act does not contain an explicit accommodation requirement, but "the Supreme Court has located a duty to accommodate in the statute generally."  *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006) (citing *Alexander v. Choate*, 469 U.S. 287, 300 (1985)).  To state a failure to accommodate claim, a plaintiff must allege that the public entity's failure to provide accommodations kept her from accessing programs, services, or activities "on the same basis as other[s]."  *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

Importantly,  "[a]ccommodations  are  'only . . . required  when  *necessary*  to  avoid discrimination *on the basis* of a disability.'" *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 529 (7th Cir. 2014) (emphasis in original) (quoting *Wisconsin Community*, 465 F.3d at 751); *see also* 42 U.S.C. § 12112.  The Seventh Circuit has interpreted the statutory language of both the ADA and Section 504 of the Rehab Act as imposing a causation requirement, meaning that a plaintiff must "prove 'that, but for his disability, he would have been able to access the services or benefits desired.'" *Holzmueller*, 881 F.3d at 593 (quoting *Wisconsin Community*, 465 F.3d at 754).

As described below, District 155 argues that E.P. was given reasonable accommodations to participate in each of the classes from which she claims she was excluded.  The court will evaluate the District's assertions as to each class in turn.

### a.     Freshman Seminar

Regarding the Freshman Seminar, the District argues that it did not exclude E.P. from attending the Seminar because it allowed E.P. to attend either in person or via V-Go.  A close look at the record, however, shows that while the District did technically permit E.P. to attend the

Seminar in person, it outright denied her requested accommodation for social distancing. On September 30, 2022, Ms. Ross requested social distancing in the Freshman Seminar to allow E.P. to attend the Seminar in person (PSOF [80] ¶¶ 3–5); but on October 4, 2022, Ms. Dahlem responded in writing that "[u]pwards of 30 students attend Seminar and are not socially distanced," and suggested that "[i]f there is a level of discomfort due to the high number of students in the space," E.P. should "attend via Vgo from another place in the building." (Def. Ex. 9 [73] at 2.) Apart from Ms. Dahlem's reference to the number of students in the Freshman Seminar, the District has not demonstrated that it could not honor Plaintiffs' requested accommodation by arranging for social distancing. It is undisputed that E.P.'s need for social distancing "was implemented in her other classrooms without issue and had been successfully applied in larger settings such as concerts and sporting events." (PSOF [80] ¶ 11; Def.'s Resp. [82] ¶ 11.) The Seventh Circuit has recognized that "[r]efusing to make reasonable accommodations [under the ADA] is tantamount to denying access," *Jaros,* 684 F.3d at 672, and a trier of fact could find, on this record, that E.P's situation is an example of *de facto* denial of access: E.P. did not attend in person because she "was never allowed a reasonable modification that would have allowed her" to do so. (Pls.' Resp. [79] ¶ 6.) The court declines to find that E.P.'s request for social distancing while in the Seminar was unreasonable as a matter of law.

Turning to the District's assertion that it reasonably accommodated E.P.'s disability by offering to allow her to attend the Freshman Seminar via V-Go, it is not immediately clear that this option was reasonable. The Seminar was designed to "allow students to meet and interact with upper classm[e]n to discuss navigating the high school experience." (PSOF [80] ¶ 2.) Virtual participation might not constitute "meaningful access" to the socio-emotional benefits of the in-person interaction offered in the Seminar. *Am. Council of Blind of Metro. Chicago v. City of Chicago*, 667 F. Supp. 3d 767, 776–78 (N.D. Ill. 2023) ("Title II of the ADA requires affirmative, proactive accommodations necessary to ensure meaningful access to public services and programs, not accommodation upon request." (citation and quotation marks omitted)); *see*

18

*generally* Laura Caprara & Cataldo Caprara, *Effects of Virtual Learning Environments: A Scoping Review of Literature*, 27 EDUC. & INFO. TECHS. 3683 (2022), https://doi.org/10.1007/s10639-021-10768-w (last visited Mar. 18, 2026) (finding that without commitment on the part of institutions to fostering social supports in virtual learning environments, "the mental health and academic achievement of [] students can deteriorate"). And a reasonable jury could find that, by effectively requiring E.P. to attend exclusively via V-Go, the District failed to integrate E.P. into "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible," i.e., the "most integrated setting appropriate" as required by both the APA and the Rehab Act. *Steimel*, 823 F.3d at 909 (quoting 28 C.F.R. pt. 35, App. B); *see also Radaszewski*, 383 F.3d at 607 (citing 28 C.F.R. § 41.51(d)).

Moreover, genuine disputes exist regarding the functionality of the V-Go, and those disputes are relevant to its reasonableness as an accommodation. Plaintiffs claim that in the times E.P. had used it before the September 30 Meeting, "it did not function properly . . . on several occasions." (Pls.' Resp. [79] ¶ 29 (quoting Ross Dep. [68] at 137:19-138:1 and citing E.P. Dep. [70] at 29:3-13).) While "[r]easonableness does not depend solely on effectiveness," as "in some circumstances, an accommodation can be reasonable even if it does not work as well as expected," *Hizer v. S. Bend Trib.*, 31 F. Supp. 3d 986, 996 (N.D. Ind. 2014) (citation and internal quotation marks omitted), at this stage there is not sufficient evidence in the record for the court to make that determination as a matter of law. Because a reasonable jury could find that the V-Go was not a reasonable accommodation that would allow E.P. meaningful access to the Freshman Seminar, summary judgment on this issue is inappropriate.

### b. VAT

As to E.P.'s exclusion from the VAT course, Defendants appear to be challenging causation, arguing that "the decision to withdraw E.P. was made because E.P. fell too far behind in the coursework due to her recovery from back surgery and the inability to attend VAT in-person because of that surgery," and not on the basis of her disability. (Def. Br. [63] at 7.) But that

19

argument looks past the reality that E.P.'s falling behind is not independent from her disability. Plaintiffs assert that but for E.P.'s disability she would not have fallen behind, therefore satisfying the ADA and Rehab Act's causation requirements. Plaintiffs claim that the District "failed to provide E.P. with the proper equipment so that she could complete the course work while attending remotely" and that "E.P. made multiple requests to be provided makeup work for the course but her requests were denied." (PSOF [80] ¶¶ 12–13.) This is sufficient to establish causation. *See Washington*, 181 F.3d at 847–49 (affirming the district court's decision to grant a preliminary injunction, and finding the high school athletic association's challenged policy discriminated on the basis of a student-athlete's disability where but-for the student's learning disability, he would not have dropped out of school, and consequently "but for his learning disability, he would have been eligible to play sports in his junior year.") *But see Holzmueller*, 881 F.3d at 593–94 (distinguishing *Washington* and finding causation requirement was not satisfied when student-athlete could not prove that, "but-for his physical disability, the normal operation of the qualifying times would have allowed him to qualify for [state finals]," because "qualifying time standards are designed to make the individual races extremely competitive, purposely excluding a great-majority of runners from reaching" the finals).

Similarly here, Plaintiffs allege that but for her disability, E.P. would not have fallen behind, therefore satisfying the ADA and Rehab Act's causation requirements. As noted above, Plaintiffs claim that the District "failed to provide E.P. with the proper equipment so that she could complete the course work while attending remotely" and that "E.P. made multiple requests to be provided makeup work for the course but her requests were denied." (PSOF [80] ¶¶ 12–13.) Defendants dispute both points. They assert that "Ms. Taylor testified that District 155 provided E.P. with the necessary computer for E.P. to participate in the VAT course," and simultaneously assert that Ms. Taylor "never had any conversations with Plaintiffs regarding the VAT course or makeup for the VAT course." (Def.'s Resp. [82] ¶ 12–13.) But taking the facts in the light most favorable to the nonmovant, as the court is required to do at this stage, Plaintiffs' account supports a finding that

20

E.P. was not provided the necessary accommodations to keep up with her work in VAT while remote learning due to her disability, and she was not provided with an opportunity to complete make-up assignments despite her requests. Facts that bear on the question—whether the District withdrew E.P. from the VAT course on the basis of her disability—are clearly disputed, foreclosing summary judgment.

On this issue, Ms. Taylor's admission that she never spoke with Plaintiffs regarding the VAT course is troubling. The ADA requires a regulated entity to "engage with the [disabled person] in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). While the entity's "failure to engage in the interactive process alone is not an independent basis for liability, it is actionable 'if it prevents identification of an appropriate accommodation for a qualified individual.'" *Id.* at 1062 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)). Plaintiffs allege that the District unilaterally made the decision to withdraw E.P. from the VAT course without prior discussion with E.P. and her family. (PSOF [80] ¶ 15.) In fact, when Ms. Ross reached out on her own to offer possible alternatives to E.P.'s withdrawal, the District rejected every one of her suggestions, evidently with no real discussion and without a satisfactory explanation, even now. (*Id.* ¶ 16; Def.'s Resp. [82] ¶ 16.) Based on the District's apparent unilateral decision-making, and the admission of Ms. Taylor—the District 155 Special Education Divisional Leader at the time— that she never spoke with E.P. or her family regarding the VAT course, a reasonable jury could find that the District failed to engage in an interactive process which prevented them from identifying a reasonable accommodation for E.P. that would have allowed her to remain enrolled in the VAT course. *Equal Emp. Opportunity Comm'n v. AutoZone, Inc.*, No. 14-CV-3385, 2022 WL 4596755, at *19 (N.D. Ill. Sept. 30, 2022) ("When a reasonable accommodation was possible and the [regulated entity] did not offer it, then responsibility for the failure to accommodate will lie

with the party that caused the breakdown in the interactive process." (citation and internal quotation marks omitted).)

The court denies summary judgment on the issue of whether the District discriminated against E.P. by failing to accommodate her enrollment in the VAT course.

### c. Studio Art

Plaintiffs' claim regarding the failure to accommodate E.P. in Studio Art bears only brief discussion. Ms. Ross and E.P. argue that the District failed to make reasonable accommodations for E.P. during her enrollment in Studio Art because Ms. Smith ultimately seated E.P. beside a trash can. This, Plaintiffs suggest, was an unreasonable accommodation in light of E.P.'s use of a ventilator and tracheal tube (the court presumes Plaintiffs believe odors from the trash can could interfere with E.P.'s ability to breathe properly, though they do not say this specifically). (*See* PSOF [80] ¶ 25.) The central fact at issue in E.P.'s claim—whether she was seated next to a trash can—is disputed by the parties. This is a triable dispute of fact that precludes summary judgment.

### 2. Intentional Discrimination

Plaintiffs also argue that the District violated the APA and Rehab Act by intentionally discriminating against E.P. on the basis of her disability. The Seventh Circuit has held that "a plaintiff can establish intentional discrimination in a Title II damage[s] action by showing deliberate indifference." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 863 (7th Cir. 2018). Deliberate indifference requires a plaintiff to show both "(1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Id.* (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)).

Plaintiffs argue that the District's employees acted "in a hostile and inflammatory manner by making statements and acting in a manner suggesting intentional discrimination" including by "mocking social distancing, alleging that E.P.'s disabilities and Ms. Ross' concern was contrived or the product of 'parent induced trauma,' alleging that Ms. Ross was a child abuser, suggesting

22

that E.P.'s physical presence in the class created a fire hazard, prohibiting friends from sitting next to E.P., and assigning E.P. to sit alone next to an open trash can despite her use of a gastrostomy feeding tube, tracheal tube and ventilator." (Pls.' Opp'n [81] at 13.) Defendants dispute nearly all of these points. (Def. Resp. [82] ¶¶ 4, 23, 25, 26–27, 34.) But taking the disputed facts in the light most favorable to the nonmovants, these facts would be sufficient to demonstrate that the District was intentionally discriminatory via its deliberate indifference to E.P.'s rights as a qualifying individual under the APA and Rehab Act. The District was unquestionably aware of E.P.'s disability, as evidenced by its engagement in the development of her IEP. And the District was repeatedly made aware of E.P.'s treatment by its employees, as Ms. Ross complained to District employees on several occasions. (PSOF [80] ¶¶ 21, 31.) Still, if Plaintiffs are to be believed, the District either failed to address, or actively facilitated, discriminatory conduct towards E.P. on the basis of her disability. Plaintiffs have alleged sufficient facts supporting the District's deliberate indifference to survive summary judgment.

### B. Retaliation

Plaintiffs allege that the District retaliated against both E.P. and her mother for their engagement in activity protected by the APA, Rehab Act, and IHRA. The District argues that summary judgment is warranted on Plaintiffs' retaliation claims because no "reasonable juror could conclude that [Plaintiffs] suffered retaliation for trying to exercise their statutory rights." (Def. Br. [63] at 8 (citation and internal quotation marks omitted).) The court disagrees.

In order to establish a *prima facie* case of retaliation, a plaintiff must show that they+69-*8//////////// (1) engaged in an activity protected by the ADA or Section 504; (2) suffered an adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *C.B. v. Bd. of Educ. of City of Chicago, Dist. 299*, 624 F. Supp. 3d 898, 920 (N.D. Ill. 2022). The Seventh Circuit has determined that requesting an accommodation for a disability is a protected activity under both the ADA and Rehab Act. *Stanek*, 783 F.3d at 643 ("The circuits that have addressed the question agree that these statutes protect a parent's request for a school

to accommodate a child's disability.") So too is lodging a complaint against an entity regulated by the statutes regarding potentially discriminatory conduct, regardless of the level of formality of the complaint. *Brode v. Xeris Pharms., Inc.*, No. 22 CV 2903, 2023 WL 7220554, at *3 (N.D. Ill. Nov. 2, 2023) ("Statutorily protected activity under the ADA can range from formal charges to informal complaints, as long as the complaint gives the employer sufficient notice that the employee is invoking her rights under the ADA or protesting ADA [] violations."). And actions taken in response to protected activity are considered "materially adverse" if the action "would dissuade a reasonable [person] from engaging in the protected activity." *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 509 (7th Cir. 2020).

Defendants do not dispute that Plaintiffs engaged in protected activity. Rather, the crux of their argument is that neither E.P. nor Ms. Ross suffered sufficiently adverse conduct in response to their protected activity. The court is not persuaded. By Plaintiff's account of the facts, E.P.'s Studio Art teacher, Ms. Smith, explicitly referenced Ms. Ross's protected activity and "warned E.P. against making any further complaint." (PSOF [80] ¶ 28.) If Plaintiffs prove that such statements were made, a reasonable juror could find that Ms. Smith took the action of seating E.P. next to the trash can as a result of her frustration with E.P. and Ms. Ross's exercise of their rights under the statutes at issue here. And, for a freshman in high school navigating the jungle of adolescent social life, being seated beside a trash can could be deeply humiliating and discourage a reasonable person from making further complaints. This fact alone is enough to proceed to trial on E.P.'s retaliation claim.

As to Ms. Ross's claims that she was retaliated against, those claims also survive summary judgment. Ms. Ross alleges that various adverse actions were taken against her after she lodged several formal and informal complaints against the District, including a threat by a District employee that they would report Ms. Ross to the authorities for child abuse. The District, disputes this fact by stating that "no District 155 employee ever reported Ms. Ross to any governmental agency," but that statement does not deny that such a threat was ever made.

24

Indeed, Ms. Dahlem *admitted* in her deposition that she did in fact mention potentially involving child protective services in a meeting with Ross on March 3, 2023. (Dahlem Dep. [65] at 80:17–82:1.) In any event, reading the facts in the light most favorable to Plaintiffs, even a threat to report a parent to child protective services would discourage a reasonable parent from continuing to request accommodations and make complaints regarding their child's treatment. *See Hamilton v. Oswego Cmty. Unit Sch. Dist. 308*, No. 20 C 0292, 2021 WL 767619, at *7 (N.D. Ill. Feb. 26, 2021) ("Having a government official appear at their door armed not only with the power to take their disabled child away but also with allegations that they are actively . . . abusing that child would surely be enough to dissuade many reasonable parents from seeking accommodations at school." (citation and internal quotation marks omitted)).

## **CONCLUSION**

Defendant's motion for summary judgment [62] is denied.

ENTER:

Dated: March 19 , 2026

_____
REBECCA R. PALLMEYER
United States District Judge

25